IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| THOMAS RHODES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-104 |
| | ) | |
| v. | ) | |
| | ) | Judge Brian C. Wimes |
| RAMSEY COUNTY MEDICAL | ) | |
| EXAMINER MICHAEL MCGEE, | ) | |
| ESTATE OF KANDIYOHI COUNTY | ) | |
| ATTORNEY BOYD BECCUE, | ) | |
| HENNEPIN COUNTY SHERIFF'S | ) | |
| OFFICE CAPTAIN WILLIAM JOSEPH | ) | |
| CHANDLER, KANDIYOHI COUNTY, | ) | |
| RAMSEY COUNTY, and HENNEPIN | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendants. | ) | JURY DEMAND |

**AMENDED COMPLAINT**

Plaintiff Thomas Rhodes, by and through his attorneys, the People's Law

Office and Law Office of Tim Phillips, hereby alleges as follows:

**INTRODUCTION**

1.      Plaintiff Thomas Rhodes is an innocent man who spent nearly 24 years

in prison for a crime he did not commit due to Defendants conspiring to have him

wrongfully prosecuted and convicted.

2.      Defendants not only fabricated evidence against Plaintiff Rhodes, they

fabricated a crime that never occurred.

3.      Plaintiff Rhodes' decades-long nightmare began on August 2, 1996,

when his wife Jane Rhodes died in a tragic boating accident at Green Lake in

1

Kandiyohi County, Minnesota. Rather than relying on the forensic and scientific evidence that demonstrated the accidental nature of Jane's death, Defendants McGee, Beccue, and Chandler conspired to manufacture false evidence against Plaintiff Rhodes in order to have him wrongfully prosecuted for murder.

4.      Defendant Michael McGee, Medical Examiner for Ramsey County, after meeting and conspiring with Kandiyohi County Attorney Boyd Beccue, produced a Medical Examiner's Report falsely asserting that Jane's death was a homicide.

5.      Defendant William Chandler, acting in concert with Defendants McGee and Beccue, fabricated evidence, including drafting police reports containing demonstrably false information intended to paint the misleading picture that Plaintiff Rhodes was lying about Jane's accidental death.

6.      The actions of Defendants led to Plaintiff Rhodes being unjustly prosecuted for murder. Based on the false evidence manufactured by Defendants, he was convicted of first-degree murder and second-degree murder by a jury on July 29, 1998. He was sentenced to life in prison.

7.      For decades, Plaintiff Rhodes steadfastly maintained his innocence and fought to have his name cleared. After years of post-conviction efforts led by the Great North Innocence Project, and following an in-depth investigation by the Conviction Review Unit of the Minnesota Attorney General's Office, Plaintiff's convictions for first-degree and second-degree murder were vacated on January 13, 2023.

8.      Plaintiff Rhodes spent nearly 24 years of his life in prison, separated from his family and friends and robbed of the most basic freedoms. He files this civil rights action to bring Defendants' misconduct to light, to hold Defendants accountable for their actions, and to seek justice for the many years of his life that he lost for a crime he did not commit.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action pursuant to the Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights as secured by the United States Constitution.

10.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this district.

## PARTIES

12.     At all times relevant to this suit, Plaintiff Thomas Rhodes was a resident of the State of Minnesota. In the summer of 1996, he lived in Mankato, Minnesota with Jane Rhodes, his wife of 15 years and their two sons, Jason, aged 9 and Eric, aged 14.

13.     At all times relevant to this suit, Defendant Michael McGee was employed as the Medical Examiner of Ramsey County and was acting as an agent for the Kandiyohi County Coroner.[1]

14.     At all times relevant to this suit, Defendant Boyd Beccue, who is deceased and therefore sued by and through his Estate by Special Administrator Judson B. Beccue, was employed as the Kandiyohi County Attorney, whose authorized duty was to act as the chief prosecutor for the County.

15.     At all times relevant to this suit, Defendant William Joseph Chandler was employed by the Hennepin County Sheriff's Department as Patrol Captain and a member of the Sheriff's Office water rescue team.

16.     Each of these named Defendants is sued in his individual capacity, and each acted under color of law and within the scope of his employment.

17.     Defendant Ramsey County is a Minnesota municipal corporation, and was the employer of Defendant Michael McGee.

18.     Defendant Kandiyohi County is a Minnesota municipal corporation, was the employer of Defendant Boyd Beccue, and engaged Defendant Michael McGee in an employer/employee relationship for purposes related to this lawsuit.

19.     Defendant Hennepin County is a Minnesota municipal corporation, and was the employer of Defendant William Joseph Chandler.

---

[1] The medicolegal death investigation system in Minnesota is County based, with some counties employing Coroners and other counties employing Medical Examiners. The qualifications, duties, and distinctions between Medical Examiners and Coroners are identified at Minn. Stat. Ann. § 390.005.

## FACTUAL ALLEGATIONS

### The Accidental Death of Jane Rhodes

20.    During the summer of 1996, Plaintiff Rhodes went on vacation with his wife Jane, their 9-year-old son Jason, their 14-year-old son Eric, and the family's Husky dog. They went to Green Lake, in the community of Spicer in Kandiyohi County, Minnesota, taking their small Baja Blast boat with them. The Baja Blast was a jet powered boat, similar to a jet ski, with low railings along the sides.

21.    This was the Rhodes family's first trip to Green Lake, where they stayed for approximately a week at a hotel next to the lake. They enjoyed a fun and relaxing family vacation, taking the boat out on the lake, swimming, fishing, walking their dog and spending time together.

22.    On August 2, 1996, the last night of their vacation, the boys played in the hotel pool late into the evening, as Plaintiff Rhodes and Jane watched over them. At approximately 11:30 p.m., after the boys had gone to bed, Plaintiff Rhodes and Jane took their boat out on the lake, with Plaintiff Rhodes driving. Neither Plaintiff Rhodes nor Jane was wearing a life jacket.

23.    After seeing another boat driving recklessly, Plaintiff Rhodes and Jane found a quieter area on the lake where they could sit in the boat, talking and spending time together. After some time, they decided to take the boat for a final ride before heading back to the hotel.

24.     Plaintiff Rhodes accelerated the boat. As the boat was speeding, Jane leaned forward, possibly to pick up an earring, lost her balance and fell over the side of the boat.

25.     Plaintiff Rhodes hastily turned the boat around and began looking for his wife, who was not a strong swimmer and was now overboard. It was dark, there was not a flashlight on the boat, and Plaintiff Rhodes had difficulty seeing anything in the water.

26.     He frantically searched, driving the boat in the area where he believed she fell in, before stopping the boat and jumping into the water in an attempt to locate her.

27.     At approximately 1:00 a.m. on August 3, Plaintiff Rhodes returned to the hotel, soaking wet, crying, convulsing, and seeking help. He pleaded for help, explaining to the hotel clerk that his wife had fallen out of the boat, which prompted the clerk to dial 911 to report the accident.

28.     Deputies from the Kandiyohi County Sheriff's Department arrived shortly thereafter. Plaintiff Rhodes accompanied them on the lake to search for Jane, and in spite of his emotional state, he did everything he could to direct them to the area where she fell in.

29.     Plaintiff Rhodes assisted the deputies in searching for Jane for approximately 30 minutes before one of the deputies directed that he be returned to shore.

30.     After returning to the hotel, Plaintiff Rhodes continued to cooperate with and assist the deputies, answering questions from detectives and agreeing to a breathalyzer test, which indicated there was no alcohol in his system.

31.     Perry Wieland, a local pastor and volunteer EMT, was also called to the scene to assist in the search and rescue. Pastor Wieland returned to the hotel and in his capacity as a pastor, he counseled Plaintiff Rhodes and advised him not to wake his sons until later in the morning.

32.     When the time came for Plaintiff Rhodes to wake his young boys, he was distraught and overcome with despair. He fell to his hands and knees at the feet of Pastor Wieland and begged for advice on what to do.

33.     Recognizing the need to share the devastating news with his children, Plaintiff Rhodes woke Eric and Jason and told them what no child wants to hear – that their mother had fallen overboard and was missing.

34.     At approximately 1:30 p.m. on August 3, 1996, two fisherman found Jane's body floating in the water against the shore.

### Defendants' Conspiracy to Manufacture
### False Evidence Against Plaintiff Rhodes

35.     On August 3, 1996, the Kandiyohi County Sheriff's Department informed Dr. Lyle Munneke, the Kandiyohi County Medical Examiner, of Jane's death. Dr. Munneke had limited experience conducting reviews of drowning victims, having only handled two or three prior to examining Jane's body.

36.     After discussing the matter with a Kandiyohi County Sheriff's Deputy and consulting with a local pathologist, Dr. Munneke and the Deputy decided that the body should be sent to Ramsey County for further examination.

37.     Defendant Michael McGee, then Medical Examiner for Ramsey County, conducted an autopsy of Jane Rhodes on August 6, 1996 at the Ramsey County Medical Examiner's Office. In doing so, he was acting as an agent for the Kandiyohi County Coroner.

38.     The forensic evidence did not support a finding of homicide.

39.     Defendant McGee listed the manner of death as "pending investigation," which continued to be Defendant McGee's finding for more than five months. During that time, he conducted further investigation.

40.     As part of that continued investigation, on January 8, 1997, Defendant McGee met with Defendant Beccue, the Kandiyohi County Attorney.

41.     This meeting occurred before a grand jury was empaneled and prior to a decision to seek an indictment. At the time this meeting took place, there was not probable cause to arrest or prosecute Plaintiff Rhodes.

42.     In this meeting, both Defendants Beccue and McGee were acting in investigative capacities, gathering clues and corroboration to obtain and/or manufacture probable cause in order to prosecute Plaintiff Rhodes.

43.     By meeting with the prosecutor to solicit non-scientific evidence that should have had no bearing on his medical determination, Defendant McGee, while acting within the scope of his employment, was acting outside the permissible

8

discretion of his authority and outside the scope of his statutory discretion as Coroner or Medical Examiner.

44.     By meeting with the Medical Examiner in an attempt to influence the determination as to cause and manner of death, Defendant Beccue, while acting within the scope of his employment, was acting outside his role as a prosecutor or an advocate for the State.

45.     This meeting took place with the intent to manipulate and fabricate evidence that would lead to the arrest and prosecution of Plaintiff Rhodes, which Defendants McGee and Beccue knew or should have known was improper, unethical, unconstitutional, and without probable cause.

46.     At this meeting, Defendant Beccue provided Defendant McGee with circumstantial facts that were completely unrelated to the medical or scientific evidence.

47.     These facts included that Plaintiff Rhodes and Jane previously had marriage problems and that on the night of the incident, officers perceived that Plaintiff Rhodes could not identify the precise location where Jane had fallen into the water.

48.     These circumstantial facts have innocent explanations and in no way implicated Plaintiff Rhodes in the death of his wife.

49.     Defendants Beccue and McGee disregarded the innocuous nature of these facts and instead used them a basis to investigate Plaintiff Rhodes, implicate

him in an alleged killing, and to fabricate evidence against him in order to pursue murder charges against him.

50.     Armed with these circumstantial, non-medical facts provided by Defendant Beccue, Defendant McGee disregarded the scientific evidence and changed his determination regarding the manner of Jane's death from "pending investigation" to "homicide."

51.     Following this meeting with Defendant Beccue and based on the non-medical evidence provided, Defendant McGee fabricated evidence against Plaintiff Rhodes. Specifically, he drafted and completed a report with the false determination that Jane's death was a homicide. This report included false conclusions that were unsupported by the scientific evidence.

52.     For example, during the autopsy, Defendant McGee observed injuries to Jane's face, which could have occurred from rubbing against the bottom of the lake, from a single strike by the hull of a boat, or from lividity. Defendant McGee falsely claimed that multiple blows from Plaintiff Rhodes' boat caused these injuries, despite the evidence suggesting otherwise.

53.     Defendant McGee fabricated this conclusion to support the finding that Jane's death was premeditated murder, as opposed to the accident that it was.

54.     Defendant McGee also observed a hemorrhage in Jane's neck, which he falsely claimed was caused by being struck by an open hand in a "V" shape, although there was no corresponding bruising to the surface of the neck. He fabricated this scientifically impossible conclusion to suggest that Jane was pushed

overboard, rather than having fallen out of the boat accidentally. This conclusion was also unsupported by the medical or scientific evidence. Rather, the medical and scientific evidence suggested that the injury to Jane's neck likely occurred during or due to the drowning process, or after her death.

55.    At the time Defendant Beccue met with Defendant McGee, he did not have probable cause to initiate the arrest or prosecution Plaintiff Rhodes.

56.    Defendant Beccue relied on Defendant McGee's report, which he helped fabricate, to convene a grand jury in order to have Plaintiff Rhodes falsely prosecuted for the murder of his wife.

57.    The notes and content of the meeting between Defendants Beccue and McGee were never disclosed to Plaintiff Rhodes or his defense counsel.

58.    In the course of the investigation and prosecution of Plaintiff Rhodes, Defendant Chandler created police reports containing knowingly false information in order to manufacture additional false inculpatory evidence against Plaintiff Rhodes.

59.    This fabricated evidence included a report authored by Defendant Chandler, dated March 26, 1997, providing his conclusion that Jane's body could not have fallen into the lake where Plaintiff Rhodes stated that she fell off the boat.

60.    The conclusions in Defendant Chandler's March 26 report were falsely framed as scientific facts and included materially and demonstrably false information.

61.     For example, Defendant Chandler stated that the temperature at the bottom of the lake where Plaintiff Rhodes told authorities he believed Jane fell in was 39 degrees Fahrenheit.

62.     Defendant Chandler claimed that due to this low temperature, Jane's body would have decomposed slowly and would have taken weeks to resurface.

63.     According to a report from the Department of Natural Resources, this claim was false. The temperature at that depth was actually 68.9 degrees Fahrenheit.

64.     The evidence fabricated by Defendants McGee, Beccue, and Chandler was manufactured in order to pursue the false theory that Jane's death was the result of premeditated, intentional homicide, rather than the accident that it was.

## The Trial and Wrongful Conviction

65.     Based on the false evidence manufactured by Defendants McGee, Chandler, and Beccue, Plaintiff Rhodes was indicted for first-degree and second-degree murder. This indictment came down sixteen months after Jane's accidental death.

66.     Under an agreement with Kandiyohi County, the Minnesota Attorney General's Office led the investigation and prosecution of the case moving forward.

67.     In furtherance of the conspiracy, Defendants McGee and Chandler met together on at least two separate occasions prior to trial, in order to perfect their false testimony to ensure that Plaintiff Rhodes was wrongfully convicted.

68.     Without any physical, scientific, or medical evidence demonstrating that Jane's death was a homicide, the prosecution's case was based on the testimony of Defendants McGee and Chandler and the reports that they, together with Beccue, manufactured.

69.     In furtherance of their conspiracy to frame Plaintiff, Defendants McGee and Chandler falsely testified that their reports were true and accurate.

70.     As a proximate result of the above-described wrongful conduct on the part of the Defendants, and on the basis of the false evidence that they fabricated, the jury convicted Plaintiff of first-degree premeditated and second-degree murder on July 29, 1998, and he was sentenced to life in prison.

71.     Plaintiff spent nearly 25 years in prison for a crime he did not commit. Minnesota's Conviction Review Unit (CRU) reviewed his case and, after a thorough investigation, determined that Defendants McGee and Chandler provided insufficient and scientifically unsupported evidence.

72.     The CRU also found that the State failed to disclose discoverable evidence, namely the notes and content from the January 1997 meeting between Defendants Beccue and McGee and the contents of the pre-trial meetings between Defendants McGee and Chandler.

73.     On January 13, 2023, Plaintiff's convictions for first-degree and second-degree murder were vacated.

13

74.     In order to be released from prison, Plaintiff Rhodes agreed to enter an Alford plea to second-degree manslaughter in exchange for a sentence of four years, time considered served.

75.     The basis articulated for this lesser charge was evidence that Plaintiff Rhodes drove the small and unstable boat in the dark, knowing his wife was not a strong swimmer and that she was not wearing a life jacket.

76.     As such, Plaintiff Rhodes spent over 20 years in prison beyond his lawful sentence, based on being convicted of a crime he did not commit.

### The Defendants' Misconduct was Committed in Furtherance of a Conspiracy

77.     All of the Defendants, acting jointly and with other members of law enforcement, as well as other unknown co-conspirators, together reached an understanding, engaged in an ongoing course of conduct and joint action, and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, including, but not limited to, fabricating inculpatory evidence and suppressing exculpatory evidence. By and through these overt acts, each Defendant, jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights.

### Defendant McGee's Sordid History
### of Fabricating Evidence

78.     Defendant McGee has a history of manipulating evidence which has caused the wrongful convictions of a number of individuals.

79.     In 2021, in *United States v. Rodriguez*, a federal district court in North Dakota issued a written opinion criticizing Defendant McGee's testimony, finding that "there is no scientific evidence to support McGee's interpretation" and that his opinion was "so unmoored from a scientific basis that it should not have been received at all." The court held that Defendant McGee has "a well-documented history of providing false or inaccurate testimony in court" and that his testimony has been "proven to not be supportable by science."

80.     In 2011, in *Minnesota v. Hansen*, a Douglas County Judge found that Defendant McGee had provided false testimony. Defendant McGee falsely claimed that the child's death was a result of a skull fracture caused by blunt force trauma while in the father's care. However, multiple doctors reviewed the evidence and disagreed with Dr. McGee regarding the cause and manner of death. As a result of Defendant McGee's fabricated evidence, Michael Ray Hansen was falsely convicted of killing his infant child and wrongfully spent six years in prison.

81.     In *State of Wisconsin v. Zimmerman*, Evan Zimmerman was wrongfully convicted of killing his former girlfriend based on the fabricated autopsy and testimony of Defendant McGee. After the Milwaukee medical examiner testified and disputed most of Defendant McGee's conclusions, the Court of Appeals reversed Zimmerman's murder conviction in 2003. The prosecutor subsequently dropped the

15

murder charges based on the lack of sufficient evidence without Defendant McGee's false testimony.

82.     In Plaintiff Rhodes' case, ten experts and forensic pathologists reviewed Defendant McGee's conclusions. All ten disagreed with Defendant McGee's classification of Jane's death as a homicide.

83.     One of those experts was Dr. Sally Aiken, a highly experienced and regarded forensic pathologist, who was retained by the CRU. Dr. Aiken reviewed Defendant McGee's conclusions and found that they were not supported by the medical evidence.

84.     Specifically, Dr. Aiken found that there was no medical support for Defendant McGee's opinion that Jane received multiple blows by a boat. She also found the medical evidence did not support the finding that Jane suffered a blow to the neck in the way Defendant McGree opined and that there was no evidence to support the finding that she was pushed from the boat.

**Damages**

85.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages, including the loss of his freedom for over 20 years, personal injuries, pain and suffering, severe mental anguish, and emotional distress.

86.     In addition, he sustained further injuries and damages, including inadequate medical care, humiliation, indignities, embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms

of personal freedom including but not limited to personal contact, employment opportunity, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations including raising his young sons, reading, television, movies, travel, enjoyment, diet, sleep, and freedom of speech and expression, for which he is entitled to monetary relief.

**COUNT I – 42 U.S.C. § 1983**
**Fourteenth Amendment – Violation of Due Process**

87.    Each paragraph of this Complaint is incorporated as if restated fully herein.

88.    As described more fully above, all of the individual Defendants named in this complaint while acting individually, jointly, and/or in concert and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

89.    In the manner described more fully above, the Defendants, individually, jointly, and/or in concert and in conspiracy, caused and/or continued Plaintiff's wrongful charging, prosecution, conviction, and imprisonment by committing or causing to be committed one or more of the following acts: (1) constructing and fabricating the false and totally unreliable statements or reports as described above, which formed the basis for Plaintiff's charging, prosecution, and conviction; and (2) withholding from the prosecutor(s), judge(s), and defense attorney(s) involved in Plaintiff's prosecution exculpatory information, including the fact that these statements or reports were false, unreliable, and fabricated.

90.     Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been jailed, convicted, imprisoned, and otherwise deprived of liberty.

91.     The Defendants' misconduct directly and proximately caused the unjust and wrongful pre-trial detention, criminal conviction, wrongful imprisonment, and deprivation of liberty of Plaintiff, thereby denying him his constitutional right to fair hearings and a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

92.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

93.     As a direct and proximate result of this violation of his constitutional right to due process, Plaintiff suffered injuries and damages as set forth above, including but not limited to loss of liberty, physical injury, and emotional distress.

## COUNT II – 42 U.S.C. § 1983
### Fourth and Fourteenth Amendment –
### Violation of the Right to Be Free From Unreasonable
### Seizures and Malicious Prosecution

94.     Each paragraph of this Complaint is incorporated as if restated fully herein.

95.     The criminal charges of first-degree and second-degree murder were brought against Plaintiff without probable cause.

96.     The criminal proceedings were initiated with no reason for Defendants to believe that the charges of murder were justified by the facts and the law.

18

97.     Defendants McGee, Beccue, and Chandler knew or should have known that a reasonable and prudent individual in their position could not conclude that the evidence constituted probable cause to request murder charges against Plaintiff.

98.     The murder charges against Plaintiff were requested with malicious intent, because Defendants McGee, Beccue, and Chandler intentionally committed acts that they had reason to believe were legally prohibited.

99.     The murder charges against Plaintiff were terminated in Plaintiff's favor on January 13, 2023.

100.     As a direct and proximate result of the actions described above, Plaintiff was seized, deprived of liberty, and suffered harm.

**COUNT III – 42 U.S.C. § 1983**
**Fourteenth Amendment – Failure to Intervene**

101.     Each paragraph of this Complaint is incorporated as if restated fully herein.

102.     The individual Defendants named in this complaint were aware of the constitutional violations as set forth above and had the opportunity and duty to intervene and prevent the violation of Plaintiff's constitutional rights, but they failed to do so.

103.     The misconduct described in this Count was objectively unreasonable and/or was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

104.     As a direct and proximate result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries as

19

set forth above, including but not limited to loss of liberty, physical harm, and emotional distress.

## COUNT IV – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

105.   Each paragraph of this Complaint is incorporated as if restated fully herein.

106.   The individual Defendants named in this complaint reached an agreement between and amongst themselves and other unnamed co-conspirators to frame Plaintiff for murdering his wife, and to thereby deprive him of his constitutional rights.

107.   The individual Defendants named in this complaint, acting in concert with other unknown co-conspirators, have conspired by concerted and joint action to accomplish an unlawful purpose by an unlawful means.

108.   In furtherance of the conspiracy, each of the co-conspirators committed one or more overt acts including, but not limited to, those set forth in the facts above, and was an otherwise willful participant in joint activity.

109.   The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

110.   As a direct and proximate result of the illicit prior agreement, conspiracy, and joint action referenced above, Plaintiff's rights were violated and he suffered the damages and injuries as previously set forth.

## COUNT V
## Malicious Prosecution Under Minnesota State Law

111.    Each paragraph of this Complaint is incorporated as if restated fully herein.

112.    The charges for first-degree and second-degree murder were brought against Plaintiff without probable cause or reasonable belief that the State of Minnesota would ultimately prevail on the merits.

113.    The criminal proceedings were initiated with no reason for Defendants to believe that the charges of murder were justified by the facts or the law.

114.    Specifically, Defendants McGee, Beccue, and Chandler knew or should have known that a reasonable and prudent individual in their position could not conclude that the evidence constituted probable cause to request murder charges against Plaintiff.

115.    The murder charges against Plaintiff were requested with malicious intent, because Defendants McGee, Beccue, and Chandler intentionally committed acts that they had reason to believe were legally prohibited.

116.    The murder charges against Plaintiff were terminated in Plaintiff's favor.

117.    As a direct and proximate result of the actions described above, Plaintiff was seized, deprived of liberty, and suffered the harm discussed above.

## COUNT VI
## Intentional Infliction of Emotional Distress

118.   Each paragraph of this Complaint is incorporated as if restated fully herein.

119.   The conduct and actions of Defendants McGee, Beccue, and Chandler were extreme and outrageous. The Defendants' actions were rooted in an abuse of power and authority, and were done intentionally, willfully and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiff severe emotional distress as set forth above.

120.   As a direct and proximate cause of the extreme and outrageous conduct of the Defendants, Plaintiff was injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Minnesota law.

## COUNT VII
## Indemnification

121.   In Minnesota, pursuant to Minn. Stat. § 466.07, public entities must pay any tort judgment for damages for which employees are liable for acts within the scope of their employment. At all times relevant to this action, Defendants McGee, Beccue, and Chandler committed the acts alleged above in the scope of their employment with and/or acting as agents for Kandiyohi County, Ramsey County, and Hennepin County. Therefore, Defendants Kandiyohi County, Rasmey County and Hennepin County are liable for any resulting damages and/or award of attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, from Defendants Kandiyohi County, Ramsey County, Hennepin County, Dr. Michael McGee, the Estate of Boyd Beccue, and William Chandler, and Plaintiff further demands punitive damages against the individual Defendants set forth above, plus attorneys' fees, the costs of this action, and any additional relief this Court deems equitable and just.

**JURY DEMAND**

Plaintiff Thomas Rhodes demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: July 12, 2024                    Respectfully submitted,

/s/ Ben H. Elson
Brad J. Thomson
Ben H. Elson*, G. Flint Taylor*,
Tayleece Paul*
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
brad@peopleslawoffice.com

*Pro Hac Vice*

/s/ Tim Phillips
Tim Phillips (#390907)
Law Office of Tim Phillips
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, MN 55401

23

(612) 470-7179
tim@timphillipslaw.com

ATTORNEYS FOR PLAINTIFF