# EXHIBIT 2

STATE OF MINNESOTA

COUNTY OF KANDIYOHI

DISTRICT COURT

EIGHTH JUDICIAL DISTRICT

Case Type: Criminal

Court File No. 34-K6-97-001529

Thomas Daniel Rhodes,

Petitioner,

vs.

State of Minnesota,

Respondent.

**AFFIDAVIT OF DR. MICHAEL McGEE**

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF RAMSEY      )

1.    Your affiant is Michael B. McGee.  I am a physician licensed to practice medicine in Minnesota and am employed as the chief medical examiner for Ramsey, Washington, Stearns, Cass, Aitkin, Clay, Kanabec, Hubbard, Nicollet, Morrison, Crow Wing, Waseca, and Murray Counties in Minnesota.  I am board certified in the specialty of pathology and the subspecialty of forensic pathology.  My curriculum vitae are appended to this affidavit as Exhibit A.

2.    These counties have Minnesota's major rivers flowing through them, namely the Mississippi, St. Croix, Minnesota, and Red Rivers, as well as dozens if not hundreds of lakes used for recreational purposes.  In addition to my duties for the listed counties I also perform forensic pathology services for other Minnesota and Wisconsin counties on a contract basis. Kandiyohi County is one of the counties for which I perform forensic pathology services on a contract basis.  Both my experience and the experiences of other pathologists in my office involve death investigations into water-related deaths including homicide, suicide, and accident.

3.      I performed an autopsy examination on the body of Jane Rhodes on August 6, 1996. I did have the opportunity to examine her body when it first arrived at the Ramsey County Medical Examiner's Office on August 3, 1996. As a result of the facial injuries I saw on her face I cautioned investigators to make a thorough examination of the circumstances surrounding her death.

4.      As is my practice I wrote a provisional report after performing the autopsy on Jane Rhodes. A copy of that provisional report is attached as Exhibit B. Because the investigation of the circumstances surrounding her death had not been completed I was not able to formulate an opinion as to the manner of death and labeled it as pending investigation.

5.      I did complete a final autopsy protocol after there had been additional investigation into the circumstances surrounding her death which was made available to me. A copy is attached as Exhibit C

6.      I was called as a witness in the grand jury inquiry in 1997, as a trial witness during the 1998 jury trial, and as a witness in the postconviction evidentiary hearing in 2001.

7.      Before completing this affidavit I have reviewed the transcripts of my testimony in this matter and the transcripts of the expert medical witnesses called by Mr. Rhodes at the trial and postconviction evidentiary hearing, namely Dr. Lindsey Thomas, Dr. John Plunkett, and Dr. Ronald Wright.

8.      At the request of the Minnesota Attorney General's Office I have reviewed the postconviction petition and memorandum and the attachments that were filed in 2014. That review did not include the 2012 recreational boating statistics or the DNR lake survey of Green Lake but did include the reports, affidavits and scientific journal articles that were recently filed with the court.

2

9.      In my approach to this case I followed the recommendation contained in "Bodies Found in the Water" by Joseph H. Davis, M.D. at A-181 of the Petitioner's Appendix:

> The determination of the cause of death of a person whose body is found in water requires careful investigative work on the part of both police and pathologists. Opinions as to the cause and manner of death should not be derived from the autopsy alone but must result from the logical correlation of data regarding victim identity, circumstances, autopsy, and laboratory findings.

10.     I note that the pathologists' reports or affidavits from Drs. Wigren, Wright, and Hyma that are attached in the Petitioner's Appendix either limited or were limited to the review of the medical findings regarding the death of Jane Rhodes. This approach is contrary to accepted practice by experienced forensic pathologists who are required to make a determination as to the cause and manner of death.

11.     According to Dr. Melinek's report she also reviewed some investigative reports and the trial transcripts but she makes no attempt to explain the evidence inconsistent with an accidental death. Additionally, her opinion that the death should be classified as an accident appears to be based only upon her conclusion that "the traumatic injuries to Mrs. Rhodes [sic] body" do not "exclusively rule in homicidal injury." A-60. Moreover, Melinek seems to conclude that Jane Rhodes may have sustained neck and scalp injuries "upon falling from the boat and/or during subsequent impacts against the hull of the vessel." A-60.

12.     According to Dr. Weedn's report he also reviewed some investigative reports, the medical findings and some photographs. However, I note that Weedn states, "Prosecutors alleged that she was beaten and pushed overboard." I never testified Jane Rhodes was "beaten," which to me indicates multiple and forceful blows to the victim. Nor did any of the investigative information provided to me indicate a "beating." Jane Rhodes did suffer antemortem trauma to the scalp, face, mouth, arms and legs to which I have testified. Weedn also incorrectly states there was "evidence of her body and in particular her head being in contact with the lake bed

3

from the autopsy report." My autopsy protocol, testimony and photographs only documented sand and gravel on the right axillary (armpit) region with vegetation in the brassiere. There was some sand on her hands that I documented with photos. There was no sand on her face or in her hair that is visible in any of the photos taken shortly after her body was removed and none was seen on her face or in her hair during the autopsy. Based on my experience this means her face did not come into contact with the shoreline as some of the petitioner's experts hypothesize. Nor is there any evidence I am aware of that if Jane Rhodes was in a face down position that she assumed a head-down posture.

13.     I was asked by the Minnesota Attorney General's Office to review the 2014 postconviction materials, the materials from the 1998 trial and 2001 postconviction hearing, and my own findings with an open mind to determine whether any of the opinions expressed at the 1998 trial or the 2001 postconviction evidentiary hearing by me should be changed. After completing that review I believe that the opinions and conclusions in the testimony I provided at the trial and postconviction evidentiary hearing were correct as relates to the death of Jane Rhodes.

14.     The pathologists whose reports are part of the 2014 postconviction materials generally opined that Jane Rhodes suffered some type of not very well described trauma to the head, that the injuries to her face were the result of the so-called dead man's float and her face coming into contact with the shore line, that the injuries to her neck were simply an artifact from drowning, and that the injury to the right side of her mouth was the result of aquatic life or snagging an object on the lake bottom. Those pathologists opined that the injuries noted in the paragraph above except for the subgaleal hematoma were postmortem. Those pathologists also opined that the hemorrhage in Jane Rhodes' forehead and face area was the result of "seepage"

4

of blood from the subgaleal hemorrhage. One of petitioner's experts, Dr. Jentzen, claimed all of the injuries were postmortem.

15.    I agree that the subgaleal hemorrhage was the result of an impact injury to Jane Rhodes' head. However, I continue to believe that there were at least two blows to her head because the autopsy photographs attached as Exhibits D and E reveal distinct areas of subgaleal hemorrhage with a margin of subgaleal tissue revealing no hemorrhage in the forehead region. Had there been only one blow to her head there would not be at least two distinct areas of hemorrhage in that area as found in the Jane Rhodes autopsy. In addition, if seepage were the reason for the hemorrhage in the forehead region, the blood would have been evenly distributed and there would not have been clear margins of subgaleal tissue that have no hemorrhage. I note Melinek seems to agree that Jane Rhodes' head may have been struck more than once by the hull of the boat, as she used the terms "subsequent impacts" in her report at A-60.

16.    In addition Jane Rhodes had two pattern injuries in the eye area and to the bridge of the nasal region as shown in the autopsy photo attached as Exhibit F. These findings are commonly seen by individuals who are struck when wearing eyeglasses. Jane Rhodes was reported to me as having needed to wear eyeglasses.

17.    The rectangular injury to the right oral region with a laceration to the corner of the mouth is not due to postmortem abrasion on the lake bottom. No gravel or sand was observed in this region at the autopsy. Furthermore, the laceration to the corner of the mouth was reapproximated with sutures as shown in the autopsy photo attached as Exhibit G. There was no loss of tissue at this site as it commonly seen in postmortem aquatic damage with which your affiant is very familiar. Had aquatic life been responsible for these injuries there would have

5

been some consumption of tissue or the classic marks on Jane Rhodes' face which knowledgeable forensic pathologists are able to attribute to fish, crayfish or turtles.

18.    The reports by the pathologists attached in the appendix and the scientific journal articles do describe neck hemorrhages which are thought to be an artifact of the drowning process.    The neck hemorrhages described in the various journal articles are unlike those I observed during Jane Rhodes' autopsy.   The soft tissue hemorrhages in the neck are described in the final autopsy protocol attached as Exhibit C on pages 12 and 13.  They are also described on pages 638 and 639 of the transcript of my testimony at the 1998 trial which are attached as Exhibit H.

19.    The hemorrhages I observed in the neck were not the result of the handling of the neck organs during the autopsy.  I did perform this portion of the autopsy as described at page 63 of my testimony at the 2001 postconviction hearing which is attached as Exhibit I.  Furthermore, this process is the one recommended in the 1951 paper by Prinsloo and Gordon referenced by Dr. Thomas in her postconviction evidentiary hearing testimony.

20.    The case report by Alexander and Jentzen referenced in the Wright affidavit as noted earlier is particularly troublesome to rely upon.  The case report by Alexander and Jentzen entitled "Neck and Scleral Hemorrhage in Drowning" was a review of a single case involving a 35-year-old man found lying face up in a swimming pool after a 5 to 10 minute interval of being missing.  One must be very cautious in applying the findings in this single case report with the findings in the Rhodes case where Jane Rhodes was in a lake for a number of hours after receiving traumatic injuries.   The subject of the Alexander and Jentzen article did not have hemorrhage in the soft tissues adjacent to the neck muscles, hemorrhage surrounding the hyoid bone or in the posterior pharyngeal region as Jane Rhodes did.  The authors concluded their

6

article by offering the following caution, "We further suggest that hemorrhage throughout the neck musculature, not just confined to its fascial surface, requires further investigation into the possibility of traumatic injury to the neck, (e.g., strangulation)."    A-150 of Petitioner's Appendix.

21.    The hypostatic mechanism and/or Prinsloo-Gordon hemorrhages of the neck were previously addressed by your affiant at pages 60 to 70 of the transcript of my testimony at the 2001 postconviction hearing and were the subject of Dr. Plunkett's testimony at the postconviction evidentiary hearing.  Neither the hypostatic mechanism nor Prinsloo-Gordon hemorrhages account for the hemorrhages in Jane Rhodes' neck for the reasons set forth in the pages referenced which are attached as Exhibit T.

22.    I have attached to this affidavit photographs of the hyoid bone and the neck organs as Exhibits J and K.  Furthermore, on each of the photographs I have marked the areas where hemorrhage is clearly visible contrary to the statement in the Melinek report at A-61.  The focal area of hemorrhage in the internal neck organs was previously testified to by your affiant as supportive of the fact that there was some trauma to Jane Rhodes' neck.  That hemorrhage was not simply an artifact of the drowning process.

23.    The Wright affidavit specifically references two journal articles, the Alexander and Jentzen article entitled "Neck and Scleral Hemorrhage in Drowning" and the article by Pollanen, et al. entitled "Hemorragic Lividity of the Neck: Controlled Induction of Hypostatic Hemorrhages," as providing the basis for Wright's opinion that the hemorrhages in Jane Rhodes' neck were postmortem.  As noted earlier the Wright opinion focuses completely on autopsy findings and does not consider the circumstances or the results of the investigation surrounding Jane Rhodes' death.  Your affiant has previously addressed the Alexander article and the

7

cautions noted in it. Specifically, the 35-year-old man found at the bottom of a pool had no surface injuries on the neck or anywhere else on the body, unlike Jane Rhodes. The hemorrhage on the surface of the multiple neck muscles were confined to the fascial surfaces of the muscle unlike the case of Jane Rhodes. Furthermore, there was congestion of the thyroid gland but no report of any hemorrhage in the hyoid bone or other neck organs as was the case for Jane Rhodes.

24. The article by Pollanen, et. al. describes an experiment involving five elderly cadavers placed in a prone position on a wooden board for 24 hours at room temperature and 24 hours at a refrigerated 39 degrees Fahrenheit is neither helpful nor applicable to the Rhodes situation. The necks of the individuals in the experiment were dissected but the findings did not correspond to those that I found during the autopsy of Jane Rhodes. After 48 hours each of the subjects had dark lividity on the ventral neck unlike Jane Rhodes. The study itself suggested several limitations. First, the subjects were elderly people with chronic disease. As noted in the study, "On this basis, the skin and soft tissue are not entirely representative of the entire age spectrum and not representative of the younger age range where difficulties with the postmortem diagnosis of neck compression often arise. Skin fragility and age related changes in connective tissue may predispose to the development of hypostatic hemorrhages in the neck, similar to the predisposition to senile ecchymosis or purpura on the upper extremities during life." A-339.

25. Perhaps most importantly the Pollanen study noted that it was unexplained "that hypostatic neck hemorrhages could not be induced in all cadavers, despite the ability to concentrate the liver mortis in the neck and even form Tardieu spots. This indicates that additional poorly understood factors determine whether hypostatic neck hemorrhages occur after

8

postmortem prone positioning, *i.e.*, post mortem prone positioning and advancing post mortem interval is necessary but perhaps not sufficient to create hypostatic hemorrhages." A-339.

26.     The Wright affidavit as mentioned makes reference to the single report of a 35-year-old male by Alexander.  Relying upon the Alexander case report to draw conclusions about Jane Rhodes' death is not well advised.  The hemorrhages described by Alexander do not correspond to those that I found during Jane Rhodes' autopsy because there is no description in the paper of intramuscular, subcutaneous, hyoid or posterior pharyngeal hemorrhages present in Jane Rhodes' neck.

27.     In summary, the reports by Drs. Wigren, Wright, Melinek and Hymal and the Wright affidavit attached in the postconviction Petitioner's Appendix are generally speaking restatements of the theories advanced by the medical experts on behalf of Mr. Rhodes at the 1998 trial and the 2001 postconviction evidentiary hearing.  In particular those findings or theories do not consider the circumstances of Jane Rhodes or the results of the investigation into her death.

28.     The Rao affidavit indicates she did not see any physical signs of a struggle.  There were, however, such signs described in the final autopsy protocol regarding focally contused tissue on the left side of the upper and lower lips (inferior and superior labrum), the right and left thighs (right and left superior patellar region), the right and left shins (tibial regions), and the right and left forearms.  A photograph of the contused tissue on the inside of the lips was admitted at trial , is attached as Exhibit L and was described on pages 617 to 619 of my trial testimony attached as Exhibit M.  The contused tissue on her forearm was described in my trial testimony on pages 634 to 636 attached as Exhibit N.  Rao states she would have expected to see a larger bruise if the mouth laceration were a stretch injury.  I submit that is exactly what I saw at

9

autopsy, testified to at trial and which is seen in the photograph of the inside of the lips attached as Exhibit L.

29.     Rao attributes the neck hemorrhages to improper handling of the body, which is purely speculative and lacking in any evidentiary support, or to lividity.  I carefully examined and photographed Jane Rhodes' clothing and saw no tears, rips or deformation suggesting improper handling of the body.  Nor were there any marks or injuries to the surface of the body suggesting improper handling.  One cannot explain the hemorrhages in the neck, especially the posterior region surrounding the hyoid bone, as coming from improper handing when no other injuries to that area were noted.  As to Rao's references to the Pollanen and Alexander/Jentzen articles, please see paragraphs 19 to 27 above.  However, I note Rao only says the neck hemorrhages "could" be attributed to "something other than external pressure;" thus, this is raised only a possibility and she concedes the hemorrhages could also be due to external pressure.

30.     Jentzen's affidavit states the autopsy report and photographs do not suggest signs of a struggle, which is incorrect for the reasons states above.  Jentzen attributes all of the injuries to postmortem artifacts on a submerged body, a conclusion rejected by most of petitioner's experts.  Jentzen states that there were no external marks on Jane Rhodes' neck to suggest strangulation, a mechanism I have never offered as the cause of the neck hemorrhages.  Nor did I ever interpret the neck hemorrhages "in isolation" as evidence of homicidal pressure.  My opinion that the manner of death was homicide was based on multiple sources of information and not just the autopsy findings.

31.     Unlike some of the petitioner's other medical experts, Dr. Weedn believes Jane Rhodes' subgaleal hemorrhages were due to postmortem livor from pooling of the blood from a

10

head down position rather than from trauma. This assertion is incorrect. Had the subgaleal hemorrhages resulted from postmortem livor, Jane Rhodes' face would have had a different appearance. As noted above, Exhibits D and E show multiple focal areas of subgaleal hemorrhage that do not have the more uniform appearance of livor.

32. Weedn's opinion that the neck hemorrhages were due to dependent lividity was a theory offered by Dr. Thomas and Dr. Plunkett at the 2001 evidentiary hearing even though at the trial Dr. Thomas said the neck hemorrhages were antemortem injuries. Weedn cites from articles by Alexander, Carter, Puschel and Pollanen to support this theory. Puschel's article is from 1999 and was previously cited by Thomas. I addressed the Puschel article in paragraph 18 of this affidavit and the Pollanen article in paragraphs 24 and 25 of this affidavit. Carter's article was from 1998 and was a subject of my testimony the 2001 hearing. See pages 69 to 70 of Exhibit T.

33. Weedn fails to note the caution in the Carter article which states, "Antemortem bruising in the anterior neck musculature should always raise the suspicion of homicide." Of the 99 drowning cases reviewed by Carter, 8 cases were identified with hemorrhage in the neck musculature with no apparent explanation such as the pressure compression of the neck or trauma. The majority of those 8 cases showed hemorrhage around and within the sternomastoid muscles and some had hemorrhage on the deeper strap muscles. In one case a 40-year-old woman was found after 12 hours with significant muscle hemorrhages in her neck and chest region.

34. Jane Rhodes had hemorrhages on the soft tissues lying next to the sternomastoid muscles as well as over and within the right sternomastoid muscle. Jane Rhodes had no muscle hemorrhages in the deeper strap muscles of the neck or chest region. If, as Weedn theorizes, the

neck hemorrhages were due to dependent lividity, I would have expected to see deposition of livor to the front of the face and stomach area with or without Tardieu spots. Attached as Exhibits O and P are photos of Jane Rhodes taken at the recovery scene and the local morgue which show no evidence of livor on her facial region. None was present when she arrived in Ramsey County. Note the difference between Jane Rhodes' face and her hands which shows the difference between antemortem trauma to the face and postmortem trauma to the hands due to contact of the hands with the lake bottom.

35.    Attached as Exhibits Q and R are photos of a woman found floating face down in a local lake after a 9-hour postmortem interval, where an intake photo was taken 2 hours and 20 minutes after recovery as well as at the examination 23 hours after recovery. Her face appears quite different from Jane Rhodes' face. Attached as Exhibit S are photos of that same woman with the scalp reflected back. Note the difference in appearance of her scalp on Exhibit S with that of Jane Rhodes' scalp shown in Exhibits D and E.

36.    Weedn attributes the lesions to Jane Rhodes' face seen at autopsy to postmortem injuries from the lake bed with no pattern injury. He attributes the darkening of the skin defects I saw at autopsy to drying. Exhibit F shows a pattern injury with distinct margins that would not be present if Weedn were correct. Weedn attributes the eye area hematomas to postmortem lividity, and claims there are no associated abrasions to the eyelids to suggest direct trauma. To the contrary, Exhibit F clearly shows an abrasion to the right eyebrow also described on page 7 of the autopsy protocol.

37.    Weedn attributes the injury to the right corner of Jane Rhodes' mouth to an object like a twig from the lake bed becoming caught on the mouth and tearing the skin due to the current rather than from depredation by aquatic life as claimed by petitioner's other experts. He

discounts trauma as the cause because he saw no external trauma to correlate with the laceration. I disagree because of the presence of the pattern injury with distinct margins that surround the mouth laceration as shown in Exhibit F. I examined the inside of the mouth and saw no internal injuries that suggested an object like a twig becoming caught on the mouth. Weedn's theory regarding the mouth is entirely speculative and not based on findings from the autopsy. However, he is correct that the laceration at the corner of the mouth is not due to postmortem aquatic life activity and he correctly describes what such activity would look like.

38.    In summary, Drs. Weedn, Rao and Jentzen did not consider all of the information available and tended to limit their review to the medical evidence alone. In addition, they looked at each finding in isolation and misinterpreted both the nature and cause of each finding. To a large extent Weedn, Rao and Jentzen simply reformulated the opinions offered at trial by Thomas and at the 2001 hearing by Thomas, Plunkett and Wright.

39.    I believe this affidavit and the attached exhibits explain why the testimony I offered at the 1998 trial and 2001 evidentiary hearing was correct and based on all of the evidence available from the autopsy and the other sources.

FURTHER AFFIANT SAYETH NOT.

_____
DR. MICHAEL McGEE

Subscribed and sworn to before me on
June 30th_____, 2014

_____
NOTARY PUBLIC


SUSAN LYNN SWANSON
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2015

13